# OPINION

## HERETOFORE WITHHELD FROM PUBLICATION PENDING RE-HEARING.

[No. 1029. Decided December 28, 1893.]

## BERTHA L. GRAETZ *et al.*, *Respondents*, v. ANGUS McKENZIE *et al.*, *Appellants.*

### PERSONAL INJURIES — SUDDEN FRIGHT — CONTRIBUTORY NEGLIGENCE.

Where parties engaged in blasting gave timely warning of an explosion, and a person warned, after taking up a position of safety, became so alarmed by the suddenness, severity and volume of the explosion, which was greater than customary, that his fright impelled him to rush from a position of safety into one of danger, in an ill-judged attempt to escape, and be killed thereby, he was chargeable with contributory negligence, barring a recovery by his widow and child on account of negligence in the management of the blast. (DUNBAR, C. J., and SCOTT, J., dissent.)

Where the testimony in an action is presented in the shape of depositions, the supreme court on appeal is warranted in setting aside the verdict of the jury when satisfied it is against the evidence, as neither the jury nor the trial court, under such circumstances, can have any advantage over the appellate court in passing upon the character and weight of the testimony.

*Appeal from Superior Court, Spokane County.*

*Turner, Graves & McKinstry,* for appellants.

*David Herman, James Dawson,* and *Jones, Belt & Quinn,* for respondents.

The opinion of the court was delivered by

STILES, J.—On the 20th day of June, 1890, appellants, while in the prosecution of grading work in the city of Spokane Falls, set off a rock blast which caused the death of Louis W. Graetz, husband of one of the respondents and father of the other. This was an action for damages

( 696 )

alleging negligence in the management of the blast. Among other defenses was that of contributory negligence on the part of the deceased, and it is urged here in support of appellants' motion for a non-suit.

The tracks of the Union Pacific railroad, running east and west, cross Washington street at right angles a few hundred feet north of the Spokane river, and in the space between the railroad and the river, east of the street, appellants were removing a ledge of rocks to prepare the ground for business purposes. South of the railroad and west of the street, and exactly at their intersection, was a one-story wooden freight house, some forty feet in width, and seventy or eighty feet long. The floor of this house was raised a few feet from the ground, after the manner of such buildings, and on the north and south sides and at the west end there was a five- or six-foot platform, which was overhung by a projecting roof. The east end of the house was flush with the street without platform or eaves. Steps led up to the platform at the northeast corner of the house; and in the east end was the office, a room about sixteen feet square. There was a door from the platform into the office, a few feet from the northeast corner, and there were two windows opening into the office in the east end of the building.

This work had been going on for several months, and on the day above mentioned a blast was made ready to be fired at noon, at a point about one hundred and fifty feet southeast of the northeast corner of the freight house. A few minutes before the blast was expected to occur, the foreman of the rock work, one Gannon, went to the freight office, gave warning of the explosion to the railroad employés, and stood on the platform at the corner of the building to watch it. The employés, several in number, left the office and took positions on the platform, under the projecting eaves, along the north side of the building.

After the fuse had been lit, and a little time before the blast exploded, deceased came south along Washington street toward the freight house, and was warned by Gannon of the blast and told to stand back. He stepped up on the platform and stood with the others, but when the explosion came, instead of remaining where he was, which turned out to be a perfectly safe place, he rushed through the office door directly toward one of the windows. At the same instant a piece of rock weighing forty or fifty pounds crashed through the windows, struck him on the head and shoulder and killed him.

The explosion was more severe and destructive than any that had previously occurred in connection with that work. Cars upon the railroad tracks had their sides crushed in, and the freight house walls were more or less damaged; but no stones except those which went through the windows entered the building. Obviously, the safest place within the range of the flying fragments was on the north platform of the freight house, since two walls, each oblique to the direction from which the pieces must come, protected anyone standing there; and, as obviously, a position in front of one of the windows was no safer than the open street. Nobody but the deceased was injured, though another man who was also a stranger there followed him into the office. When the building began to be struck the others ran farther west along the platform.

Appellants were pursuing a lawful work, which, for the six or seven months during which they had carried it on, had caused injury to no one. But by carrying it on in such a way as necessarily to throw rocks over upon the street and adjacent property, as was the case at every blast, they maintained a nuisance and were liable for such damage as they might do. In this respect this case differed from *Klepsch v. Donald*, 4 Wash. 436 (30 Pac. 991), and was, in principle, like *Wright v. Compton*, 53 Ind. 337;

*St. Peter v. Denison*, 58 N. Y. 416, and *Munro v. Dredging Co.*, 84 Cal. 515 (24 Pac. 303). Fair warning, however, of an impending blast was impliedly held, in *Wright v. Compton* and *St. Peter v. Denison*, to be such extraordinary care as would have absolved the defendants, if the plaintiffs had failed to heed it; and such must be the case by all rules of good sense.

Under the motion for a non-suit made in the court below, the question of warning became the vital one in the case, and the only theory upon which the motion could have been denied must have been that it was a question for the jury, whether the warning given was not so shortly before the explosion that deceased had no time for reasonable action.

We say this was the only theory, because, to a man of the most ordinary intelligence, the mere suggestion of a rock blast right ahead would lead to his taking such measures as lay in his power to insure his safety; and deceased, in the language of the complaint, "was a strong, healthy, sober man, twenty-four years of age, a skilled and expert bricklayer and competent carpenter and joiner;" conditions not attainable without intelligence. The evidence on this point for the respondents consisted of the testimony of three eye witnesses.

A. W. Curtis was a clerk in the freight office. After Gannon had given the warning, this witness went to the south door of the freight house, where he assisted a lady and some children to get into the house, and then walked across to the north platform at a point about fifty feet west of the office door, and almost immediately the blast went off. He placed the warning at a minute or a minute and a half before the explosion, and testified that deceased had just reached the platform at the moment of the explosion, and that he rushed right into the office. Heard nothing said to deceased by anyone. He did not quicken his pace at all until he got on the platform; after that he seemed to do so.

P. S. Webb, another freight clerk, testified to a much
more deliberate proceeding. After receiving the warning,
witness stepped out of the office to the north platform, where
Gannon was. There was no one else there for some time
until a stranger came along from the north, and was stopped
by the foreman and told to step back as there was to be a
blast. Shortly after this another man came, and was also
detained for the same reason. The foreman said all there
would better get back along the north side of the ware-
house; but none heeded the advice. The second man to
join the group was deceased; and his arrival was about five
minutes before the blast occurred. Deceased said nothing,
but remained with the group until the explosion took place.
Immediately upon that, witness ran west along the plat-
form, but returned at once and found deceased inside the
office on the floor.

John Williamson came from his home on his way to
the *Review* building. Saw Gannon and two other men
standing at the corner of the building on the platform.
Gannon told him a blast was going off and to look out or
stand back. Went up on the platform and stood there
with Gannon, deceased and a railroad official. Stood right
alongside of deceased for four or five minutes until the
blast went off. Heard a remark passed that it was rather
long going off. As soon as the rocks began to come de-
ceased ran into the office and witness as close behind him
as he could get. Deceased was standing on the platform
when witness came up. Stood at a point four or five feet
from the east end of the freight depot. Deceased was
within two or three feet of the window when struck and
right opposite to it.

None of these witnesses were present at the trial, their
testimony being presented by depositions taken at times
several weeks apart. Neither the jury nor the trial court
were, therefore, in any better position to judge of this testi-
mony than ourselves; and we think it must be accepted
that Curtis was mistaken in his statement.

The only disagreement between Webb and Williamson
is, that the former makes deceased the second man to reach

the platform, while the latter says that Graetz was there first. They both say that after the last man arrived some five minutes elapsed before the explosion. Curtis heard nothing said to deceased, but the others did, and they were within a very few feet of him and Gannon, while Curtis was at no time within fifty feet, and he says he did not see any of them until just at the instant of the explosion. In no other way than that something was said to him could the presence of deceased on the platform at all be accounted for; otherwise he would have gone on his way down the street. And if he was spoken to and called to the platform, it undoubtedly was coupled with information concerning the blast. Nothing was visible to indicate danger, and it must have been the warning from Gannon that caused him to stop, go up the steps and join the rest. He was warned, therefore. But with even one minute's warning of this kind, there was ample time to avail himself of all the protection the building afforded; for in that time he could have walked the whole length of it at a pace of a mile an hour. In two minutes, walking twice as fast, he could have been far beyond any place where the evidence shows any stone to have fallen.

There was a small triangle at the east end of the platform, which the building did not shelter from stones hurled upon it in a direct line; but the rest of it was as safe as the walls of the building were strong. Webb and Curtis were both called out of the office and to the platform for the purpose of getting them out of danger. Webb reports Gannon as advising that they go back along the platform; Williamson that he told him, in the hearing of deceased, to stand back. They did not stand back, but argued rightly that they were safe enough where they were, close to the wall and several feet from the corner. Gannon was nearer the corner than they were.

Now, unless appellants are responsible for the impulse or

fright which seized deceased, as soon as the crash came, to get away from where he was, they are not liable for his death, because, although they did not point out to him a particular spot which was safe and say: "You stand there;" they informed him of the danger in time for him to adopt any one of several courses, and invited him to remain either with them or along on the platform, one part of which was about as safe as another. The exercise of ordinary intelligence only was necessary to insure safety. To be sure, the hail of stones upon the building was, doubtless, alarming, but something of the kind was to be expected, else there would have been no occasion for taking refuge. The panic which led the deceased into the office must have been totally unforeseen, and could not have been provided against.

There is a line of cases which hold that where one precipitates a danger suddenly upon another, the liability for damages is not avoided, although the person threatened himself cause his injury by an ill-judged attempt to escape, when if he had remained quiet the injury would not have occurred. But no such case is reported where timely warning of the peril had been given and the person warned, after taking up a position of safety, had abandoned it and sought some other, in doing which the casualty happened.

Respondents were responsible for the testimony of witnesses Webb and Williamson, and for the credibility of each, and their depositions furnished a clear preponderance of the evidence that it was four or five minutes after deceased went upon the platform before the blast went off, and that it was his own voluntary act which caused him to go into the office, abandoning his safe position on the platform. The jury were not at liberty to disregard the evidence and find but a momentary warning upon the testimony of Curtis, and the court was bound to take notice of the state of the evidence which would require the granting of

a new trial if a verdict were found for plaintiffs. Thompson on Trials, § 2250, and cases cited.

There must be a reversal of the judgment, and remanding of the cause with directions to sustain the motion for a non-suit.

So ordered.

HOYT and ANDERS, JJ., concur.

DUNBAR, C. J., and SCOTT, J., dissent.