The action is brought to recover damages for the negligent killing of Herbert H. Burgess, a fireman in the employment of the Southern Railway Company, the lessee of the defendant, at Selma N.C. 29 April, 1909. *Page 402 
These issues were submitted to the jury:
1. Was the intestate of the plaintiff killed by the negligence of the lessee of the defendant, as alleged in the complaint? Answer: Yes.
2. Did the intestate of the plaintiff contribute to his death by his own negligence? Answer: No.
3. What amount, if any, is the plaintiff entitled to recover? Answer: $2,000.
From the judgment rendered defendant appealed. The facts are sufficiently stated in the opinion of the Court.
There are twenty-three assignments of error in the record, none of them relating to the reception or rejection of evidence. These assignments present for consideration the three principal contentions of the defendant:
1. That the act of Congress of 22 April, 1908, known as the Federal Employers' Liability Act, applies, and that the cause should have been determined under the provisions of that act.
2. That there is no sufficient evidence of negligence.
3. That in any view of the evidence, the intestate was guilty of such contributory negligence as under the law of this State bars recovery.
Does the Federal act Apply?
(499) Plaintiff's intestate was fireman of engine 862, which was standing at the time of the occurrence on the cinder track at Selma, N.C. He had been oiling his engine and preparing it to take a train from Selma to Greensboro, which was made up at Selma. He started across the tracks to go to his boarding house before leaving, and was stricken and killed by a local switch engine, which at the time was backing down the main line for the purpose of cutting out two cars, which had come in from Pinners Point, Va., on train 72 for transportation to Greensboro, N.C. Train 72 is known as Pinners Point train via Selma to Goldsboro, N.C.
Engine 862 was not attached to any cars at the time, but was being prepared to haul a train from Selma to Greensboro composed of miscellaneous cars. All cars brought in from Pinners Point, Va., by train 72 for points west of Selma are included in this train.
We are of opinion that the Federal act does not apply, and that the case was properly tried under the State law.
The act applies only to a carrier by railroad while engaging in interstate commerce, and only to an employee "suffering injury while he is employed by such carrier in such commerce." *Page 403 
The point was not discussed on the argument or in the briefs, but it occurs to us that the North Carolina Railroad is not an interstate railroad, nor is that corporation itself engaged in interstate commerce. Its tracks and property lie wholly within the State of North Carolina, extending from Goldsboro to Charlotte. It is true, the tracks and property are leased to the Southern Railway Company, a corporation of another State, that is engaged in both inter- and intrastate commerce; but that does not necessarily make the North Carolina Railroad Company an interstate carrier within the meaning of the act of Congress, any more than A would be made a wholesale grocery merchant because he had leased his warehouse to B, who conducted such business in it, and had assumed responsibility for B's debts.
The corporation known as the North Carolina Railroad Company is in existence, has its officers and directors, receives its annual rents from its lessee, the Southern Railway Company, and distributes them among its stockholders; but it is not an interstate carrier within the meaning of the Federal act. (500)
It is also true that this Court has held in Logan v. R. R., 116 N.C. 941, that this lessor is responsible for all acts of negligence of its lessee occurring in the conduct of business on the lessor's road, it matters not what kind of commerce the lessee is engaged in at the time. But that is because a railroad corporation cannot escape its responsibility by leasing its road. It is still liable for its lessee's acts of commission and omission, whether they occur in interstate or intrastate commerce, although the lessor is not actually engaged in either.
We do not think the Federal act applies, for the reason that the deceased at the time when killed was not employed by the Southern Railway, the lessee, in interstate commerce. At the time he was killed the deceased was not engaged in an act of any kind of commerce. He was on the way to his boarding house for a purpose entirely personal to himself and not on the carrier's business. The deceased had oiled and prepared his engine to make the run from Selma to Greensboro, points within this State. The engine was stationary and had not been attached to any cars. The deceased was on his way to his boarding house, and was killed by a local switch engine which was then unattached to any cars, but going for two cars from Pinners Point, Va., for the purpose of attaching them to the train that engine 862 was expected to pull. So far as the evidence shows, the deceased nor his engine had ever been engaged in any other work except this local run from Selma to Greensboro.
If the contention of the defendant can be maintained, then it follows that all employees of railways that do an interstate business are necessarily employed in interstate commerce. The ticket seller who sells a *Page 404 
ticket to a traveler going beyond the State, the car cleaner who cleans the car he is to travel in, the man who loads the engine tender with coal which is to pull him, and the gatekeeper who examines his ticket and passes him on to his car, are all employed in interstate commerce.
The Employers' Liability Act of 1906 was declared repugnant to the Constitution because by its terms it embraced all employees of a (501) railroad, interstate and intrastate, and that the two were so inter-blended in the statute that they were incapable of separation.Employers' Liability cases, 207 U.S. 463. If the contention of the learned counsel for defendant be well founded, then the subsequent act of 1908 would apply to all employees of a railway engaged in both kinds of commerce, however remotely they are connected with it. This would accomplish the very end which it would seem could not be accomplished by the Federal Congress under the first act. The contention would extend the power of Congress to almost every conceivable subject of railway transportation, however inherently local, and would destroy the authority of the States over matters which from the beginning have been under their control.
Was the evidence of negligence sufficient to justify the court in submitting the matter to the jury? We think so. The evidence offered by plaintiff tends to prove that the deceased was compelled to cross the several tracks of the railroad to go from his engine to his residence; that it was customary for all employes to pass to and fro over these tracks; that it was dark at the time and the switching engine was running backwards, tender foremost, from fifteen to twenty miles an hour. Two witnesses testify that there was no light whatever on the end of the tender that was moving forward, nor was any flagman there. This is ample evidence of negligence to go to the jury. Ray v. R. R., 141 N.C. 84; Smith v. R.R., 132 N.C. 819; Purnell v. R. R., 122 N.C. 832.
Was the plaintiff's intestate, in any view of the evidence, guilty of such contributory negligence as bars recovery? We think not, and that his Honor properly submitted that matter to the consideration of the jury. Had it appeared from the evidence offered by plaintiff that his intestate was guilty of contributory negligence, it is settled by precedents that the court may sustain the motion to nonsuit or direct a verdict upon that issue. Baker v. R. R., 150 N.C. 562; Strickland v. R. R., ib., 4.
Under the conditions surrounding the intestate we cannot say, as matter of law, that in any view of the evidence he was guilty of contributory negligence. His Honor properly submitted the matter to (502) the jury under what is commonly known as the rule of the *Page 405 
prudent man. There is strong evidence of contributory negligence, but the evidence is not all of that character from which only one inference can be drawn.
If nothing appeared in evidence except the testimony of Oliver, the engineer of the switching engine that killed the intestate, it may be that the court might well have sustained the defendant's contention. But there are many facts and circumstances in evidence which tend to exculpate the intestate and to explain his conduct. The intestate was evidently in a hurry to go to his residence and return to his engine; he was compelled to cross six tracks; there was no other way; it was the universal custom for the employees to cross these tracks passing to and from their places of residence on the south side; the big freight engine 719 was standing on the track about eight feet from main line with its blower on, making a very loud noise, so that the bell of the switching engine could not be heard by the intestate, who at the time came from behind No. 719 and started to step on main track and was killed by the switch engine. The engineer of that engine says that the intestate did not look, and that if he had looked he could have seen the switch engine. That is the construction put by the engineer upon intestate's conduct from the engineer's point of view, but under all the circumstances, taking the evidence as a whole, it ought not to be held to be conclusive. The intestate could not well hear the ringing bell or the approach of the switch engine because of the blowing off of 719. It was dark and possibly he could not see the switch engine. He had the right to rely upon the invariable requirement that an approaching engine would display a headlight at night. Had there been a headlight he probably would have seen it before he stepped upon the track. The absence of it may have misled him, and lured him to his death.
While an employee must exercise reasonable care, the rule that one who crosses a railroad track must, as a matter of law, look and listen before doing so, does not apply in all its strictness to one who is employed in a railroad yard and whose duties make it necessary for him to go frequently upon the tracks. Wolf v. R. R., 154 N.C. (503) 571; Sherrill v. R. R., 140 N.C. 255; Weiss v. Bethlehem IronCo., 88 Fed., 23; R. R., v. Jackson, 78 Ark. 100; R. R. v. Peterson,156 Ind. 364; Shoner v. Pennsylvania Co., 130 Ind. 170; McMarshall v.R. R., 80 Iowa 757; Jordan v. R. R., 58 Minn. 8.
It is well said by Mr. Justice Manning in his clear and well-considered opinion in Farris v. R. R., 151 N.C. 483: "While we are in no wise inclined to relieve the person crossing the tracks of a railroad from the imperative duty of observing the measure of caution so well established for his safety by the well-considered decisions of this and other courts, *Page 406 
yet `it cannot always be said that he is guilty of contributory negligence, as a matter of law, because he did not continue to look and listen at all times continuously for approaching trains, where he was misled by the company or his attention was rightfully directed to something else as well' (3 Elliott on Railroads, sec. 1166a), or that he failed to look in opposite directions at the same moment of time."
Taking into consideration the whole evidence, and weighing the conditions and circumstances surrounding the intestate, we are of opinion that his Honor properly submitted the question of contributory negligence to the jury and overruled the motion to nonsuit.
The charge is a full and clear presentation of both sides of the controversy, and we find no error in it of which the defendant can justly complain.
No error.
Cited: Myers v. R. R., 162 N.C. 345; Renn v. R. R., 170 N.C. 150;Hinson v. R. R., 172 N.C. 652.
(504)