ELIZABETH HULL, Administratrix,

*vs.*

## THE PHILADELPHIA & READING RAILWAY COMPANY.

*Railroads: agreements as to use of tracks by another railroad.
Federal Employers' Liability Act.*

The agreement between the Western Maryland Railroad and the Philadelphia & Reading Railroad, by which the latter agreed that the trains of the former might use portions of its lines, does not render the crews of the Western Maryland Railroad, while taking such trains over the lines of the Philadelphia & Reading Railroad, the employees of the latter; and for the death of one of them while so employed, the P. & R. Railroad Company is not liable under the terms of the Federal Employers' Liability Act.                                    p. 552

The fact that the crews of the Western Maryland Railroad, while operating its trains over the lines of the P. & R. R. Co., were to be subject to the rules of the latter does not affect the question, nor have the effect of making them its employees.
                                    p. 550

*Decided April 3rd, 1918.*

Appeal from the Circuit Court for Washington County (KEEDY, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Urner, Stockbridge and Constable, JJ.

*Omar T. Kaylor* and *Frank G. Wagaman,* for the appellant.

*H. H. Keedy, Jr.,* (with whom was *Chas C. Keedy* on the brief), for the appellee.

Boyd, C. J., delivered the opinion of the Court.

This is an appeal from a judgment rendered in favor of the defendant (appellee) in a suit brought by the appellant under the Federal Employers' Liability Act* to recover for loss sustained by reason of the death of John M. Hull in Harrisburg, Pa. There are three counts in the declaration, all of which allege that John M. Hull, the son of Elizabeth Hull, the plaintiff, was at the time of the injuries and death complained of, and for some time prior thereto had been a servant and employee of the defendant, and was employed and engaged in the performance of his duties in interstate commerce. The alleged negligence relied on is stated differently in the three counts, but it is only necessary to say that the declaration is sufficient to bring the case within the Federal Employers' Liability Act, if the facts sustained it. The defendant filed the general issue plea and one alleging that John M. Hull was not on or about the 17th of March, 1917, or at any other time, a servant or employee of the defendant. At the conclusion of the testimony offered by the plaintiff the defendant offered a prayer that "under the pleadings in this case there is no evidence legally sufficient to entitle the plaintiff to recover and their verdict must be for the defendant." That was granted and a verdict was rendered accordingly, upon which the judgment appealed from was entered.

---

*1908 (35 Stat. at L. 65, Ch. 149, U. S. Comp. Stat., 1909, p. 1171).

Mr. Hull belonged to a crew employed by the Western
Maryland Railway Company and was freight brakeman. The
day before the accident the crew had taken a train, hauled by
a Western Maryland engine and operated by Western Mary-
land employees from Hagerstown, Md., to Rutherford, Pa.,
and when he was killed the same crew was engaged in taking
a train from Rutherford to Hagerstown. The Western Mary-
land road extends from Hagerstown, Md., to Lurgan, Pa.,
and the defendant's road from Lurgan to Rutherford, and for
the purpose of operating trains from Hagerstown to Ruther-
ford and back the two roads entered into an agreement which
will be referred to later.

We will first consider the question suggested by the special
plea—whether Hull was an employee of the defendant within
the meaning of the Federal Employer's Liability Act. There
can be no doubt about his being engaged in interstate com-
merce. Robert A. Warner, conductor of the train, testified
that they had taken a train from Hagerstown to Ruther-
ford—arriving at the latter place some time the day before,
and were called about 12:15 A. M. on the 17th of March by
the yard-master of the Rutherford yard of the defendant com-
pany. He directed them to get a train of cars off the west-
bound yard and pick up seven cars at Harrisburg. They pro-
ceeded from Rutherford to Harrisburg on the west-bound
main track, on which track their train was standing when
they stopped for the seven cars, which they added to their
train. The yard-master at the Rutherford yard gave him
instructions as to the operations connected with the move-
ment of the train. The Philadelphia & Reading supplied the
person to take the place of Hull as a member of the crew
after he was killed. The witness said that his instructions
were that when on the line of the Philadelphia & Reading
he should obey the rules and instructions of that company.

The Federal Employers' Liability Act provides: "That
every common carrier by railroad while engaging in com-
merce between any of the several States or territories * * *
shall be liable in damages to any person suffering injury

while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his personal representatives for the benefit of the surviving widow or husband and children of such employee * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier," etc.   There have already been a large number of decisions on various questions which have arisen under Employers' Liability Acts in the State and Federal Courts, but it is rather remarkable that there are not more directly bearing upon the question we have before us.

One of the principal cases relied on by the appellant is *North Carolina Railroad Company* v. *Zachary*, 232 U. S. 248, Ann. Cas. 1914 C, 159.   In that case it was shown that the North Carolina Railroad Company was not an interstate railroad—its tracks and property lying wholly within the State—but it had leased its road to the Southern Railway Company, which is an interstate railway, and a fireman employed by the latter company in interstate commerce was killed on the road of the lessor by the alleged negligence of the lessee.   JUSTICE PITNEY said in the early part of his opinion that: "Under the local law as laid down in *Logan* v. *North Carolina R. R. Co.*, 116 N. C. 940, 21 S. E. 959, the lessor is responsible for all acts of negligence of its lessee occurring in the conduct of business upon the lessor's road; and this upon the ground that a railroad corporation can not evade its public duty and responsibility by leasing its road to another corporation, in the absence of a statute expressly exempting it.   The responsibility is held to extend to employees of the lessee, injured through the negligence of the latter."   After referring to the decision of the lower Court in 156 N. C. 500, 72 S. E. 858, he said: "It is plain enough, however, that the effect of the rule thus laid down, especially in view of the grounds upon which it is based, is that although a railroad lease as between the parties may have the force and effect of an ordinary lease, yet with respect to the railroad operations conducted under it, and everything that

relates to the performance of the public duties assumed by the lessor under its charter, such a lease—certainly so far as concerns the rights of third parties, including employees as well as patrons—constitutes the lessee the lessor's substitute or agent, so that for whatever the lessee does or fails to do, whether in interstate or intrastate commerce, the lessor is responsible. This being the legal situation under the local law, it seems to us that it must and does result, in the case before us, that the lessor is a 'common carrier by railroad engaging in commerce between the States' and that the deceased was 'employed by such carrier in such commerce' within the meaning of the Federal Act; provided, of course, he was employed by the lessee, in such commerce at the time he was killed."

In the case of *Southern Ry. Co.* v. *Lloyd*, 239 U. S. 496, an engineer in the general employ of the Southern Railway Co., was injured on the road of the North Carolina Railway Co., being the same company mentioned in the *Zachary case,* and the relation was the same between the two companies as in that. The plaintiff sued and recovered judgment against both companies, which was affirmed by the Supreme Court of the State and later by the Supreme Court of the United States—citing the *Zachary case* as the authority for it.

We quoted at length from the *Zachary case* because the appellant relied so strongly on it, and, being decided by the Supreme Court of the United States, it is necessary to ascertain whether it is applicable to this case. After giving it our most careful consideration we have reached the conclusion that it is not. JUSTICE PITNEY shows clearly that the decision is based on the local law of North Carolina, as announced by the Supreme Court of that State, which makes a lessor railway company responsible for all acts of negligence of its lessee occurring in the conduct of business upon the lessor's road, as is seen by the quotations we have made. He said what the Act clearly declares, that in order to bring the case within the terms of the Federal Act, "defendant must have been, at the time of the occurrence in question, engaged as a common carrier in interstate commerce, and

plaintiff's intestate must have been employed by said carrier in such commerce." As the North Carolina R. R. Co., had made the lease without being authorized by a statute expressly exempting it, it could not escape its responsibility under the rule adopted in that State, and JUSTICE PITNEY said, as shown above, that the lease "constitutes the lessee the lessor's *substitute or agent,* so that for whatever the lessee does or fails to do, whether in interstate or intrastate commerce, the lessor is responsible" (italics ours). No such relation exists between these two railroad companies. There was no lease, and the appellee had not turned over its charter duties to the Western Maryland Ry. Co. It was still in the discharge of those duties, but the two companies by agreement used each other's tracks in the performance of their duties in certain interstate commerce.

It is not unusual for two railroad companies to make such, or similar arrangements. Sometimes there is the relation of lessor and lessee, and, without citing the cases in the notes, it will be seen by reference to 33 *Cyc.* 703-707, that the Courts are not altogether in harmony in reference to some matters arising when that relation exists. Then there are a number of cases which have arisen when one company has permitted the use of its road by another, *Ibid.* 710, and still others, where companies were operating or using roads of others, *Ibid.* 713. When we are called upon to ascertain whether a person is a servant or employee of another, sometimes the question arises as to whether, although he is a general servant of one master, he has become the servant of another, in some particular employment. See 26 *Cyc.* 1285, where the effect of the servant of one master being under the control of another is considered, but on the next page of that volume it is said: "The fact that one railroad company uses the track and stations of another under contract between them does not as a rule make the employees of either company fellow-servants with the employees of the other." It is undoubtedly true that two railroad companies operating under such a contract as the one in this case bear a very

different relation to each other from those operating under a lease, where one has practically turned over the operations of its road to the other.

Hull was unquestionably an employee of the Western Maryland Railway Company, and not of the appellee, until he reached Lurgan on his trip the day before he was killed, and would have been as soon as he reached Lurgan on the return trip, had he not been killed. To hold that he had ceased to be an employee of the Western Maryland and had become one of the appellee from the time he reached Lurgan would be contrary to what is generally understood by the term "employee," and would unquestionably be contrary to the spirit, if not the letter of the agreement between the two companies, which was offered in evidence by the appellant. There is not the slightest suggestion in that agreement that the crew of one company was to be regarded as the crew of the other, while on the latter's line. We will refer to such parts of the agreement as we deem material:

Paragraph 2 is as follows:

"Freight trains to run through between Hagerstown and Rutherford in both directions and each company agrees to supply motive power in the above proportions so as to equalize the service performed."

Paragraph 4 provides that:

"Crews of each road to run through with their engines over the line of the other company."

Paragraph 5 provides in part that:

Each company to compensate the other for the use of the other's engines and crews on their line at the rates per hour set out. Time to begin at Rutherford and Hagerstown when crew is called for.

Paragraphs 6, 7, 8, 9 and 10 are as follows:

"6.   The division of earnings of traffic not to be disturbed or in any way affected by this arrangement.

"7.   Each company to furnish fuel and other supplies to its own engines and crews; any furnished by one to the other to be upon agreed uniform rates.

"8.   No charge shall be made for water and terminal facilities.

"9.   Neither company to be expected to do the engine cleaning and wiping for the other; where done, a charge of seventy-five (75) cents per engine to be made.

"10.   Each company to be responsible and bear all damage and expenses to persons and property caused by all accidents upon its road."

Paragraphs 16 to 21, inclusive, are as follows:

"16.   Each company to relieve and return as promptly as practicable the engines and crews of the other at ends of runs.

"17.   Each company to have the right to object and to enforce objection to any unsatisfactory employee of the other running upon its line.

"18.   All cases of violation of rules or other derelictions by the employees of one company while upon the road of the other shall be promptly investigated by the owning company, and the result reported to the employing company, with or without suggestions for disciplining, the employing company to report to the other the action taken.

"19.   Accident reports on prescribed forms to be promptly made of all such occurrences, and where a crew of one company is operating upon the road of the other, a copy must be sent to the proper officer of each company.

"20.   The employees of each company to be required to report promptly, on notice, to the proper officer of the other, for investigations of accidents, etc., the fullest co-operation to be given by the one company to the other in all such matters.

"21.  The employees of each company while upon
the tracks of the other shall be subject to and con-
form to the rules, regulations, discipline and orders
of the owning company."

There would seem to be no doubt that the provisions of
the contract referred to above show that the two companies
did not intend to make the regular employees of the one com-
pany the employees of the other, when on the latter's line—
on the contrary, it is apparent that they intended the very
opposite.  The appellant relies on paragraph 10, but there
is nothing in that to show that the employees of the other
company are to be regarded as employees of the owning
company.  The appellee would undoubtedly be responsible
to an employee of the Western Maryland Railway Company
for injuries sustained by reason of the negligence of the
appellee's employees or agents, but not under the Federal
Employers' Liability Act.  Suppose that Act had not been
passed before this accident, could it have been successfully
contended that the appellee was not responsible for the death
of Hull because its employees were his fellow servants?
That would have extended the fellow-servant doctrine very
far, and certainly beyond what had been done in this State.
In *P., W. & B. R. R. Co.* v. *State, use Bitzer,* 58 Md. 372,
400, that company, the B. & O. R. R. Co. and other railroad
companies had an agreement with reference to the use of the
defendant's road in Baltimore.  There was an agreement
between the companies in that case.  This Court said: "What-
ever effect this agreement might have upon the parties to it,
it could not have any upon strangers to it, nor alter nor
change the relations of either of them towards third parties,
nor have the effect of making those, who were employed and
paid wages by either of the contracting parties, the co-em-
ployees of the agents and workmen of the other parties, nor
make the others liable, either severally or jointly, for any
loss or damage caused by the neglect of any one of them,

even had the agreement been silent in this respect. But in order to guard against any such result, the agreement itself expressly provides, that 'if an accident shall happen whereby damages to persons or property shall be incurred, the party on whose road the same shall happen shall alone be responsible.' " It will be observed that paragraph 10 is not a new provision in such agreements. The opinion went on to say in reference to the principle that every employee assumes the risk of the negligence of his co-employees. "Samuel Bitzer was not employed or paid by the appellant, but was employed by the Baltimore and Ohio Railroad Company, and therefore this principle is not applicable to him." That case settled the question for this State, that the employees of the several railroad companies could not, in working under such an agreement, be considered co-employees. One of the objects of this Act, as explained by Senator Doliver on the floor of the Senate, was to modify the old law of the negligence of co-employees. He spoke of the law in this country that an employee injured by the negligence of a fellow workman could not recover, and said: "This bill abolishes that doctrine, and gives the employees the right to recover for injuries arising from the negligence of his fellow workman. That is the first proposition. The second proposition modifies the law whereby in other generations workmen were held by the Court to assume the risk arising from defective machinery." *Thornton on the Federal Employers' Liability and Safety Appliance Acts* (2nd Ed.), Sec. 1. It is obvious that there was no necessity to pass the Federal Act for the benefit of the employees of one company when injured by those of another company, under such circumstances as we have in this case, so far as the doctrine of fellow-servant is concerned. It would be regarded as carrying the doctrine to an unjustifiable extreme, if in a suit for the death of Hull, brought outside of this Act, the defense of fellow-servant had been allowed. Under the language of the Federal Act there is less ground for holding the employees of the several com-

panies to be co-employees, then there was in such a case as Bitzer's. The general principle is also recognized in *Bentley, Shriver & Co.* v. *Edwards,* 100 Md. 652, although that was not a railroad case.

In the case of *Robinson* v. *B. & O. R. R. Co.,* 237 U. S. 84, Robinson was a porter on a Pullman car, was required to obey the rules and regulations of the railroad company, and collected tickets and fares from passengers coming on the train after 3 o'clock A. M. He was injured by the alleged negligence of the railroad company and sued under the Federal Employer's Act. It was held that he was not an employee within the meaning of that Act. JUSTICE HUGHES said: "We are of the opinion that Congress used the words 'employee' and 'employed' in the statute in their natural sense, and intended to describe the conventional relation of employer and employee. It was well known that there were on interstate trains persons engaged in various services for other masters. Congress, familiar with this situation, did not use any appropriate expression which could be taken to indicate a purpose to include such persons among those to whom the railroad company was to be liable under the Act." So it may be said that Congress may have been presumed to know that such arrangements as existed between these two companies were often made, and if it had intended to make the employees of the "owning company," as the agreement calls it, co-employees of the other company, it would have used language "to indicate a purpose to include" them.

The fact that the crews of the other company were subject to the rules and regulations of the owning company can not be material in determining the question. This is, of course, necessary for the safety of all persons traveling on the line of the owning company, as well as all working on it. The business could not be successfully conducted on a road over which many trains ran, if the "employees of each company", to use the language of paragraph 21, while upon the tracks of

the other, were not subject to and required to conform "to the rules, regulations, discipline and orders of the owning company." But that would certainly not have the effect of making them employees of the owning company, any more than it would the porter on a Pullman car, or an express agent, or mail agent traveling on the train. In *Oliver* v. *Northern Pac. Ry. Co.,* 196 Fed. 432, it was held by the U. S. District Court that a porter on a Pullman car could recover under the Federal Act under the circumstances of that case, but the decision was based on the ground that he was employed by an association composed of the railroad company and the Pullman Company, which were joint owners of 50 cars. In *Mo., K. & T. Ry.* v. *Blalach,* 147 S. W. 559 (Texas), an agent of an express company who handled baggage, but there was no proof of employment by the railroad company, was held to be a passenger and not an employee within the meaning of the Act. See also *Same Company* v. *West,* 134 Pac. 655, to the same effect. It is the duty of the owning company to use all reasonable efforts to protect the employees of what we might call the "visiting company," and even if there was no agreement on the subject, the owning company could enforce such rules and regulations as are necessary for the protection of its own employees and property, as well as those of the other company.

We have not thought it necessary to discuss the case of *Standard Oil Co.* v. *Anderson,* 212 U. S. 215, and other cases cited by the appellant, as we do not think they are applicable to the facts of this case. That a general servant or employee of one company may become the servant or employee of another in some special employment cannot be doubted. For convenience we cited above 28 *Cyc.* 1285, where many such cases are referred to. We cannot agree, however, with the appellant that when Hull was killed he was engaged in work for the appellee in the sense the authorities speak of such employment. His crew was then taking a train to their regular employer's road—one of the very

things they were employed by the Western Maryland Ry. Co. to do. The distance between Hagerstown and Rutherford, as shown by the agreement, was eighty-one miles and a regular run of the crews was from Hagerstown to Rutherford and return, just as it was with the crews of the appellee from Rutherford to Hagerstown and return. But after all this case does not turn on nice distinctions as to whether a person can be said to be an employee under certain facts and not under other facts, but whether John M. Hull was an employee of the appellee within the meaning of the Federal Employers' Act. For reasons we have stated, we feel constrained to hold that he was not.

We are of the opinion, then, that under the language of the Act, under the agreement between the two companies, so far as it is binding (and the appellant put it in evidence) and under what we regard as the reasonable and practicable view of the question, as well as under such authorities as we deem applicable, we must hold that the Federal Employers' Liability Act does not apply to this case. As that conclusion must result in an affirmance of the judgment, it is unnecessary to discuss the question of negligence.

*Judgment affirmed, the appellant to pay the costs*